## BAY AREA TYPOGRAPHICAL UNION, UNION NO. 21; Sharmaine Dyson; and Dale Spencer, Plaintiffs–Appellants,

### v.

## ALAMEDA NEWSPAPERS, INC., d/b/a The Daily Review, Defendant–Appellee.

### No. 89–15140.

United States Court of Appeals, Ninth Circuit.

Submitted March 12, 1990.[*]

Decided April 10, 1990.

---

* The panel finds this case appropriate for submission without oral argument pursuant to Ninth Circuit Rule 34–4 and Fed.R.App.P. 34(a).

Duane B. Beeson, Beeson, Tayer, Silbert, Bodine & Livingston, San Francisco, Cal., for plaintiffs-appellants.

Richard C. Lowe, Kenneth E. Douthat, Michael D. Oesterle, King & Ballow, Nashville, Tenn., and Boyd E. Burnison, Crosby, Heafey, Roach & May, Oakland, Cal., for defendant-appellee.

Before SNEED, FARRIS and FERNANDEZ, Circuit Judges.

FERNANDEZ, Circuit Judge:

Bay Area Typographical Union No. 21 (the Union), Sharmaine Dyson, and Dale Spencer (collectively appellants) brought this action to enforce a purported contract between the Union and Alameda Newspapers, Inc. (Alameda). Appellants claimed that there was an agreement under which Dyson and Spencer kept their seniority and other rights, even though they had been on extended leaves of absence. The district court, after a bench trial, found that there was no such agreement and granted judgment in favor of Alameda. We affirm.

## BACKGROUND FACTS

For some years prior to July of 1985, Sparks Printing Co. (Sparks) was the publisher of "The Daily Review," a newspaper. Dyson and Spencer were employed in the composing room of the newspaper, and were represented by the Union, which had a collective bargaining agreement with Sparks. That agreement, among other things, provided for the payment of disability benefits, established employees' seniority rights, and guaranteed a lifetime job for certain long-term employees. The latter was accomplished by way of a no layoff list. Spencer was a long-term employee, Dyson was not.

On March 19, 1985, Spencer took a disability leave. Dyson took disability leave on March 24, 1985. Both remained on disability leave until about January of 1986, when they sought to return to work at the newspaper.

Unfortunately for Dyson and Spencer, many changes had occurred while they were away on disability leave. On July 1, 1985, Alameda purchased The Daily Review from Sparks. Alameda promptly notified the Union that it would not recognize the collective bargaining agreement that the Union had with Sparks. However, it did express its willingness to meet and confer with the Union regarding terms and conditions of a new agreement.

The first meeting between Alameda and the Union took place on July 15, 1985. Since the collective bargaining agreement had been repudiated by Alameda, discussion naturally turned to the terms and conditions of employment which were to be used while a new agreement was being negotiated. Alameda said that it would continue the status quo until circumstances required changes. The district court credited testimony that the gist of the statement was that Alameda would abide by the old terms until it suited Alameda's fancy to change them. In general, events bore that out. Alameda did generally follow the terms, but also made it clear that it did not feel bound to do so. For example, it did not pay employees for a full day's work when they left early on account of illness, it did not provide certain credits toward unemployment benefits, and it refused to implement a scheduled wage increase. It also installed video display terminals. Moreover, when in these and other instanc-

es the Union filed grievances and requested arbitration, Alameda representatives did meet with the Union officials but clearly stated that was being done as a courtesy. They reiterated the fact that they were not bound by the old collective bargaining agreement with Sparks and they refused to arbitrate.

On the other hand, Alameda did continue to make disability payments to Dyson and Spencer, and had taken no steps to eliminate the seniority list or to refuse to recognize the no layoff list. In fact, Alameda specifically recognized the existence of each of those one way or another. In addition, shortly after Alameda took over the newspaper, it allowed one employee, who had been on disability leave, to return and to keep his prior seniority. He had been on leave for a relatively short time, and his position had not yet been refilled by a permanent employee.

When Spencer sought to return to his employment, lower management personnel initially expressed their willingness to allow him to do so at his former seniority level. However, as soon as upper management heard of that, it issued a memorandum which indicated that people who were not active on July 1, 1985 did not maintain their seniority or their lifetime guarantee. Spencer and the Union were notified of that. The same treatment was accorded to Dyson.

Appellants then commenced this action on the theory that Alameda had breached an oral contract to recognize the priority rights of the composing room employees.

## JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction over this dispute, as do we, since it is an action for breach of a contract between the Union and Alameda. *See Local 3–7, International Woodworkers of America v. DAW Forest Products Co.*, 833 F.2d 789, 792 (9th Cir.1987); Labor Management Relations Act, § 301(a), 29 U.S.C. § 185(a).

In this area of the law, as in others, we review findings of fact under the clearly erroneous standard and issues of law de novo. Contract interpretation can involve each of these standards, for findings regarding what the parties did are reviewed by application of the clearly erroneous standard, while principles of contract interpretation applied to those findings are reviewed de novo. Moreover, interpretations of contract language without the use of extrinsic evidence are reviewed de novo. *See L.K. Comstock & Co. v. United Eng'rs & Constructors Inc.*, 880 F.2d 219, 221 (9th Cir.1989). Perhaps more directly pertinent to the task at hand, we treat findings regarding the parties' intent to create a contract as factual, and apply the clearly erroneous standard of review. *See Local 3–7 International Woodworkers of America v. DAW Forest Products Co.*, 833 F.2d at 793. *See also Hospital and Institutional Workers Local 250 v. Pasatiempo Development Corp.*, 627 F.2d 1011 (9th Cir. 1980), *cert. denied*, 450 U.S. 918, 101 S.Ct. 1362, 67 L.Ed.2d 344 (1981), (hereafter *Pasatiempo*).

## DISCUSSION

There can be little doubt that Alameda repudiated the contract that the Union had with Sparks. It did so in no uncertain terms. Thus, we are not faced with a situation where repudiation of the collective bargaining agreement is in any doubt. *See NLRB v. World Evangelism, Inc.*, 656 F.2d 1349 (9th Cir.1981). To the extent that it was questioned, that is a factual issue which was properly resolved against the appellants.

The question is whether Alameda and the Union somehow resurrected the provisions of the moribund collective bargaining agreement by their later words or actions, or at least whether they did so as to the issue of priorities. In approaching this question we must simply apply the usual principles of contract law to the collective bargaining context. *See Local 3–7 International Woodworkers of America v. DAW Forest Products Co.*, 833 F.2d at 793–96 (intent and enforceability), and *Warehousemen's Union Local 206 v. Con-*

tinental Can Co., *821 F.2d 1348 (9th Cir. 1987) (offer and acceptance)*.

While the parties' words or actions may result in a contract, the mere fact that a successor employer maintains terms of employment during a period of negotiations is not necessarily sufficient to require a finding that it has agreed to be bound by those terms. As we said in *Pasatiempo*, 627 F.2d at 1012:

> Pasatiempo's maintenance of terms and conditions of employment, including the settling of employee grievances short of arbitration, was consistent with its statutory duty as a successor employer to bargain with the incumbent union. This conduct, and any oral commitments to this effect, are not sufficient to imply an agreement to be bound by the predecessor's expired contract, including the arbitration terms.

This is further illustrated by the district court's decision in *General Warehousemen and Employees Union Local No. 636 v. J.C. Penney Co.*, 484 F.Supp. 130 (W.D.Pa. 1980), a case cited approvingly in *Pasatiempo*. The district court pointed out that even where an employer had agreed to extend certain terms and conditions of the former collective bargaining agreement, it did not follow that *all* terms and conditions were in effect. It thus refused to enforce an arbitration term. *See also Proctor & Gamble Indep. Union v. Proctor & Gamble Mfg. Co.*, 312 F.2d 181 (2nd Cir.1962), *cert. denied*, 374 U.S. 830, 83 S.Ct. 1872, 10 L.Ed.2d 1053 (1963).

It is true that if an employer says it is adopting the old terms, it can be bound to those terms. *See NLRB v. World Evangelism, Inc.*, 656 F.2d at 1355. It is also true that words followed by action may evince the fact that there is a contract. *See Warehousemen's Union Local 206 v. Continental Can Co.*, 821 F.2d at 1349–51. Yet, one must ultimately look to the circumstances which exist in the particular case when one seeks to discover whether an agreement does exist.

In this case, we cannot say that the district court erred in finding the absence of an agreement. Alameda's unequivocal repudiation of the prior collective bargaining agreement was not belied by any steps it took thereafter. Even when it said that the conditions of the old agreement would be followed during the negotiations period, it carefully retained the right to make changes that it deemed appropriate. Appellants vigorously contest the district court's finding in this respect, but that finding is supported by the evidence. Indeed, as the district court noted, one of the Union's own negotiators took it that Alameda had reserved the right to make changes when it suited its fancy to do so.

The Union suggests that industrial peace will be adversely affected if we do not find that Alameda was contractually bound to recognize the priority rights of Dyson and Spencer. Even assuming that we should focus on consequentialist arguments of that kind, we find the argument unpersuasive. In fact, it might even be more disruptive to tell successor employers that they must either change all terms and conditions or face a determination that they have become contractually bound to all of them. As the court said in *Proctor & Gamble Indep. Union v. Proctor & Gamble Mfg. Co.*, 312 F.2d at 184, it is perfectly natural to allow things to remain as is during negotiations, but that does not mean that an agreement has been entered into.

We do not dispute the fact that the failure to disturb the seniority rights and the no layoff list until this particular situation arose has some evidentiary value. So too does permitting one employee to return to work from disability leave. But it is only evidence, and the district court did not err when it found that those facts failed to overcome all of the other indicia of Alameda's unwillingness to be bound by the terms of the old collective bargaining agreement. The numerous refusals to follow the terms of the old agreement and the frequent reminders to the Union that those terms were not in effect support the district court's decision, as do the statements at the first meeting.[1]

1. We note that the district court found that even if there were an agreement, it was not enforce-

Finally, we note that *Pasatiempo*, 627 F.2d 1011, *Proctor & Gamble*, 312 F.2d 181, and *General Warehousemen and Employees Union*, 484 F.Supp. 130, were all concerned with arbitration, while the case at hand is focused on the other terms and conditions of employment. That, however, is a distinction without a difference. It does not affect the basic need to determine whether an agreement regarding the particular terms was entered into. Here the district court found no such agreement. That determination was not clearly erroneous.

## CONCLUSION

We hold that the district court did not err when it determined that Alameda did not enter into an agreement with the Union to protect the seniority and no layoff rights of employees who were on disability leave at the time that Alameda acquired The Daily Review.

AFFIRMED.

able, since it was too vague. Because we uphold the finding that there was no such agreement regarding these priorities, we need not moot the knotty vagueness question. See the discussion in *Local 3-7 Woodworkers of America v. DAW Forest Products Co.*, 833 F.2d at 793–96.