BRASPORT, S.A., Plaintiff,

v.

HOECHST CELANESE CORPORATION, Celanese International Marketing Company, Inc., Fiber Industries Inc., and Ian Whittal, Defendants.

No. 88 Civ. 3957 (RLC).

United States District Court, S.D. New York.

Aug. 16, 1990.

Coudert Brothers Attorneys (Mark D. Lebow, Allen C. Wasserman, of counsel), New York City, for plaintiff.

Mayer, Brown & Platt (Marc E. Kasowitz, Daniel R. Benson, Jack Atkin, Walter E. Bard, of counsel), New York City, for defendants.

ROBERT L. CARTER, District Judge.

Plaintiff Brasport, S.A. ("Brasport"), is an Argentine corporation with its principal place of business in Buenos Aires, Argentina. Brasport was incorporated on November 16, 1982, as a wholly-owned subsidiary corporation of Comexport, a Brazilian corporation with its principal place of business in Sao Paulo, Brazil. Arthur Goldlust is Chairman of the Board of Comexport and a member of the Board of Directors of Brasport.

Defendant Hoechst Celanese Corporation, formerly Celanese, is a Delaware Corporation with its principal of business in New Jersey.

Defendant Celanese International Marketing Company is a Delaware corporation and a wholly owned subsidiary of Celanese.

Defendant Fiber Industries is a Delaware corporation and a wholly owned subsidiary of Celanese. The above defendants (hereinafter referred to collectively as "Celanese") are manufacturers and sellers of textile products.

Defendant Ian Whittall was the Celanese South America area sales manager for its textile products during the period in question and had supervisory responsibility for sales in Argentina of the Celanese products specified in the representation agreement between Brasport and Celanese.

## I.

Prior to April 9, 1983, Armando Bachman, S.A., was the sole representative of Celanese in Argentina for the sale of various textile products. Juan Fabbri was the head of Bachman's textile department.

Fabbri wanted Celanese to engage him as its exclusive representative in Argentina, but Celanese was reluctant to do so without Fabbri being backed by or part of a company or organization. In that connection, Bruno Beer and Edward Weber, executives of Celbras, Celanese–Brazil, had conversations in October, 1982, with Arthur Goldlust of Comexport in the latter's office in Sao Paulo and explored with him the idea of Comexport establishing an organization in Buenos Aires, headed by Fabbri whom they praised highly, which would become Celanese's exclusive sales representative in Argentina. Goldlust went to Buenos Aires in mid-November to meet with Fabbri. On his return to Sao Paulo, he advised Celanese that he would establish Brasport in Buenos Aires with Fabbri as its managing director.

On November 24, 1982, Fabbri gave notice to Bachman of his decision to leave, effective December 15th. A termination agreement was reached which provided for payment to Fabbri of $20,000 in owed commissions. Bachman saw the announcement of Fabbri's association with Brasport in a newspaper dated December 29, 1982.

In January, 1983, Celanese notified Bachman that it was terminating the representation agreement, effective April 8, 1983. On or about April 9, 1983, Celanese entered into a representation agreement with Brasport.

Felix Bachman, chief executive officer of Bachman, testified that in or about January, 1983, he learned that Fabbri had been stealing from the company, selling Celanese products to Bachman customers on his own and pocketing funds which were owed to Bachman. On learning of these dishonesties and disloyalties, Bachman stated he informed Dennis Sabourin, a Celanese official, and Whittall of what he knew of Fabbri's illicit activities at a dinner in February, 1983, in Montevideo.

Sabourin and Whittall deny that any such conversation about Fabbri's improprieties took place. Sabourin does not remember Fabbri being discussed at the dinner. Whittall remembers Fabbri being discussed, but in the context of Bachman expressing hurt that Fabbri whom he had introduced into the business and treated like a son had left his employ.

Bachman did not advise any of the Celanese customers that Fabbri was dishonest, although he insisted on accompanying Whittall in visits to these customers in the period January to March, 1983, to insure a smooth transfer to Brasport. Nor did he ever advise Comexport, Brasport or Goldlust of these facts, and he did not lodge any complaints with authorities about the matter or take any legal action against Fabbri.

In or about late 1985, or early 1986, Goldlust began to suspect that something was not right with Fabbri's operation of Brasport, and in December, 1986, he launched an investigation. Many improprieties were found. Fabbri had diverted income received from Celanese and intended for Brasport to his own pocket. He had established his own companies and channeled business to them. He permitted his

own companies to make long-delayed payments for the products they bought from Brasport, a practice which resulted in considerable losses for Brasport in light of the inflationary spiral in Argentina. He also double-billed Brasport for expenses.

Fabbri functioned as Brasport's managing director until April, 1987, when Goldlust succeeded in having him removed from office, but he stayed on as an employee until July, 1987. Celanese notified Brasport by letter dated July 28, 1987, that it was exercising its option to terminate the representation agreement 90 days from the date of the receipt of the notice. On or about October 27, 1987, the agreement was terminated.

From the period of April 9, 1983, until November 4, 1987, Celanese paid Brasport $334,948.89 in commissions. All checks were sent to Brasport at its Buenos Aires address.

## II.

In June, 1988, plaintiff instituted this action, alleging as a first cause of action that Celanese was in breach of the representation agreement in failing to pay Brasport commissions due; alleging as a second cause of action that Celanese had made direct sales of some products in Argentina in violation of the representation agreement; alleging as a third cause of action a conspiracy between Celanese and Fabbri to divert customers, commissions and business opportunities from Brasport to Fabbri; alleging as a fourth cause of action that Whittall had induced Celanese and Fabbri to deal with companies in Argentina other than Brasport, and that he and Fabbri had caused Celanese to terminate the representation agreement; and alleging as a fifth cause of action plaintiff's right to an accounting in light of defendants' breach of their fiduciary duty owed to plaintiff. Prior to trial, plaintiff abandoned the fifth cause of action seeking an accounting. The matter came to trial before the court on May 1–3, 1990.

At the trial, plaintiff did not seek to prove the allegations in its complaint but proceeded on a new set of theories. Plaintiff asserts that Celanese should pay commissions on account of Celanese sales to Coafi, S.A., a new Celanese customer, because Celanese failed to establish any 'oral agreement' altering the written obligation to pay such commissions. Contending that Celanese is responsible for Fabbri being placed in the position where he could harm Brasport, plaintiff seeks to recover from Celanese commissions not received because checks sent by Celanese were intercepted, diverted or cashed by Fabbri.

Plaintiff asserts that "Celanese should reimburse Brasport for Fabbri's theft of Brasport's government bonds, diversion of product and subsequent payment with devalued currency and double billing of expenses" in that Fabbri acted more as Celanese's agent than Brasport's. Plaintiff also asserts that Celanese failed to perform its fiduciary obligation to inform Brasport of similar misconduct by Fabbri known to Celanese, thereby facilitating Brasport's losses.

Plaintiff seeks punitive damages in the sum of $3,000,000 based on Celanese's failing to inform Brasport of Fabbri's misconduct at Bachman's, installing him as controlling person at Brasport, failing to advise Brasport that Fabbri had told Whittall of his theft of Brasport bearer government bonds, terminating the representation agreement after Brasport discharged Fabbri, continuing to deal with Fabbri after his discharge by Brasport, refusing to cooperate in the investigation of Fabbri, and ceasing to do business with Comexport when charges were pressed against Fabbri.

## III.

No evidence was adduced at trial to prove the second cause of action in the complaint alleging that defendants breached the representation agreement by making direct sales of their products to third parties, or to prove the third cause of action alleging that defendants conspired with Fabbri to divert clients, business opportunities and commissions from Brasport to Fabbri and entities controlled by him. Accordingly, these two causes of action must be dismissed for failure of proof.

No evidence was adduced at trial to prove the fourth cause of action in the complaint alleging that Whittall induced and caused breach of the representation agreement and its termination. Accordingly, this cause of action must also be dismissed for failure of proof. Moreover, at the onset of trial, Whittall, without objection, was dismissed as a defendant from the action for lack of subject matter jurisdiction.

■ As to the remainder of the contentions in the complaint and under plaintiff's new theory, the evidence establishes that Celanese recommended Fabbri to Goldlust sometime in October, 1982, and that Brasport was incorporated in mid-November, 1982, and Fabbri made its executive head later in November, 1982. The evidence at trial also establishes that Felix Bachman did not learn of Fabbri's improprieties until January, 1983, and did not inform Celanese officials of what he had learned until February, 1983. Thus, Celanese officials cannot be held responsible for failing to inform Goldlust or Brasport in October or November, 1982, of something the record shows at best only became known to them some three or four months later.

Both Sabourin and Whittall deny that Bachman provided them with any adverse information about Fabbri in February, 1983, or at any other time. Felix Bachman's testimony on this matter lacks credibility in any event. He never advised Celanese's customers in Argentina about Fabbri's dishonesty, although he made it a point to have personal contact with those customers when he accompanied Celanese on visits to them between January and March, 1983, to insure a smooth transfer from his company to Brasport. He never repudiated the termination agreement reached in December, 1982, which obligated him to pay Fabbri $20,000–$35,000 in 12 monthly installments in 1983. He never took legal action against Fabbri and never advised Brasport about Fabbri's sins.

On the basis of this record, assuming arguendo that Celanese had a fiduciary duty to inform Brasport, Comexport and/or Goldlust, there is no evidence that Celanese possessed any knowledge about Fabbri before he was hired by Brasport to negate the favorable opinion of Fabbri which Celanese officials may have expressed to Goldlust. In addition, there is no credible evidence that Celanese gained any such knowledge subsequently, with the exception of Fabbri's statement to Whittall about the government bonds, which will be addressed later.

■ Celanese and Brasport had a commercial relationship, pure and simple. Brasport was Celanese's exclusive agent for the sale of the latter's products, as specified in the representative agreement. There was no "intimate relationship" between Celanese and Brasport to warrant application of more rigorous obligations on Celanese. *Morse v. Swank, Inc.,* 459 F.Supp. 660, 667–668 (S.D.N.Y.1978) (Tenney, J.) (quoting *Coolite Corp. v. American Cyanamid Co.,* 52 A.D.2d 486, 488, 384 N.Y.S.2d 808, 811 (1st Dept.1976)). Under New York law, a manufacturer has no fiduciary duty to its exclusive sales agent. *See Rodgers v. Roulette Records, Inc.,* 677 F.Supp. 731, 739 (S.D.N.Y.1988) (Kram, J.); *Sanshoe Trading Corp. v. Mitsubishi International Corp.,* 122 Misc.2d 585, 586, 470 N.Y.S.2d 991, 993 (N.Y.Sup. Ct.1984), *aff'd,* 104 A.D.2d 337, 479 N.Y. S.2d 149 (1st Dept.1984).

There is nothing in the record to show that Celanese had any knowledge or information concerning Fabbri's improprieties while at Brasport—reimbursement for prepaid travel expenses, delayed payments to Brasport by Fabbri's companies, interception of Celanese commission checks, or unauthorized withdrawals of money.

There was no evidence of Whittall being privy to or participating in these or any other of Fabbri's improprieties. There was no evidence of any financial relationship between Fabbri and Whittall, or of any payments by Fabbri to Whittall or to any other Celanese personnel.

Plaintiff devotes a substantial portion of its brief arguing about liability for material misrepresentations and the duty to disclose, but presented no evidence of any misrepresentations by Celanese to Brasport

or the withholding by the former of any factual data or information it was contractually required to provide Brasport.

Plaintiff's reliance on the obligation under New York law of fair dealing and good faith between the contracting parties, *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Company*, 30 N.Y.2d 34, 45, 330 N.Y.S.2d 329, 333, 281 N.E.2d 142 *cert. denied*, 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972); *De Laurentiis v. Cinematografica de las Americas, S.A.*, 9 N.Y.2d 503, 509–510, 215 N.Y.S.2d 60, 63, 174 N.E.2d 736, 739 (1961); *Goodstein Construction Corp. v. New York*, 111 A.D.2d 49, 51, 489 N.Y.S.2d 175, 177 (1st Dept.1985), *aff'd*, 67 N.Y.2d 990, 502 N.Y.S.2d 994, 494 N.E.2d 99 (1986), is irrelevant. There is nothing to show the defendants in violation of this obligation.

Brasport hired Fabbri without making any inquiries of Bachman, even though Goldlust knew that Fabbri had only recently terminated his employment with Bachman. Bachman did not learn of Fabbri's unsavory conduct until January, 1983, several months after Brasport came into being and Fabbri was engaged to head it. The failure, however, to solicit the impressions of Fabbri's immediate former employer before deciding to employ him is indicative of the imprudent manner in which plaintiff allowed Fabbri to function in Buenos Aires without oversight by any of Goldlust's senior and trusted employees in the substantial Comexport operations. The real cause of plaintiff's exposure to Fabbri's fraudulent activities was its own negligence in failing to monitor Fabbri's activities in Buenos Aires. Although highly recommended by Celanese, Fabbri was a new employee unknown to Comexport personnel. Prudent business practice would seem to mandate close supervision, at least at the outset, of Fabbri's functioning as the chief officer of a company—apparently a new experience for him—particularly given that the stated reason for Celanese's approach to Comexport to establish an organization in Argentina to act as Celanese's agent was because Celanese was not prepared to give its business to Fabbri without organizational resources to back him up. Fab-

bri was left almost wholly unsupervised until suspicious circumstances in 1985 or 1986 caused Goldlust to institute an investigation of his activities. Apparently once launched the investigators had no difficulty in uncovering Fabbri's theft and other kinds of unsavory conduct.

The evidence disclosed that Celanese mailed all commissions due Brasport to Brasport's address in Buenos Aires. The evidence presented at trial provides circumstantial evidence that someone at Brasport, presumably Fabbri, appropriated those checks to his or her own use. There is no evidence, however, that anyone connected with Celanese was a party to such appropriation. In sending the checks to Brasport at the proper address, Celanese fulfilled its obligation fully. The law in New York is straight forward on this issue. A debtor's obligation to its creditor is discharged when a check payable to the creditor is sent to the creditor or its authorized agent, even though wrongfully endorsed by the agent or the latter absconds with the proceeds. *Hutzler v. Hertz Corp.*, 39 N.Y.2d 209, 215, 383 N.Y.S.2d 266, 269, 347 N.E.2d 627 (1976); *Alicia Ocean Transport, S.A. v. Rollins Burdick Hunter, Inc.*, 621 F.Supp. 479, 483 n. 13 (S.D.N.Y. 1985) (MacMahon, J.) (receipt of checks by agent payable to principal or to agent where given authority to collect the debt constitutes payment to principal).

Under these circumstances Celanese cannot be held liable because Fabbri may have misappropriated the commission checks sent to Brasport. Celanese was under no obligation, as plaintiff seems to suggest, to monitor the endorsements on the checks to be certain that each had been properly endorsed by Brasport. Indeed, Celanese is in no position to monitor the endorsements on the commission checks it sends to its various agents.

In sum, while there was testimony that Fabbri had engaged in dishonest acts and had diverted from Brasport commissions paid it by Celanese, there was no evidence that Celanese had failed to send checks to Brasport for all commissions due in full

discharge of its obligations under the representation agreement. Accordingly, the first cause of action of the complaint is dismissed for failure of proof.

■ Brasport identified Coafi as a company for which commissions for sales ($12,-600) was due from Celanese. The evidence at trial, however, showed that Celbras, through Edward Weber and Joao Hercoles, and Brasport, through Fabbri, entered into an oral agreement pursuant to which Brasport agreed to waive its right to receive commissions on the Coafi sales. Coafi was a new customer, and the agreement was reached because the promotional sales price was set so low. This agreement was shown in the export permits which were required to be filed with the Brazilian government and which were introduced into evidence through the testimony of Dr. Juan Paulo Camargo De Toledo, general counsel for Celbras. His testimony was not challenged on this issue.

Celbras was Celanese's agent and affiliate in respect of most sales of Celanese products covered by the representation agreement. Plaintiff cannot claim that Celbras could not make such an agreement with Brasport because it was not a party to the representation agreement. As defendants point out in their brief, such a claim would undermine the sole basis for plaintiff's contention that Celanese bears responsibility for Brasport's hiring of Fabbri and its resultant woes. The record is clear that plaintiff claims through Goldlust's testimony that Bruno Beer and Edward Weber, both officials of Celbras, recommended Fabbri to him at a meeting in Sao Paulo. Apparently in pre-trial testimony he had placed Whittall at the meeting. Whittall has denied being present and at trial Goldlust stated that he was no longer certain of Whittall's presence at the Sao Paulo meeting when the Celanese people spoke to him about Fabbri. Thus the only link from Celanese to Brasport's hiring of Fabbri is Celbras. Plaintiff cannot contend that Celbras' recommendation is binding on Celanese in respect of the hiring of Fabbri, but that Celbras cannot act for Celanese to bind Brasport and Celanese to a waiver of

commissions in a special case. The oral agreement to waive the Coafi commissions was valid and no commissions from Celanese for the Coafi promotional sales are owed to Brasport.

■ Whittall testified that Fabbri told him that he had appropriated Brasport's bearer government bonds. Whittall never reported this conversation to Brasport. Fabbri left a receipt for the bonds in Brasport's safe and the receipt was introduced at trial. Fabbri told Whittall that he was taking the bonds to protect himself against the failure of Brasport to pay him all that was due, and that he had advised Brasport that he had taken the bonds. The evidence is clear that Brasport had knowledge of the taking, and Whittall was under no obligation to report to Brasport his conversation with Fabbri.

Plaintiff, as can be inferred from the above discussion, has provided no evidence to justify an award of punitive damages.

### IV.

Defendants assert that plaintiff failed to honor its obligations to provide defendants with documents in its possession when defendants made various discovery requests. Felix Bachman provided plaintiff with an affidavit concerning the events about which he testified at trial, but the affidavit was not furnished to defendants until March, 1990, although the affidavit is dated December 28, 1989. Bachman also testified that he provided plaintiff with documents in early 1988 relating to matters about which he testified at trial, but these documents were not given to defendants until the eve of trial. He testified that he wrote a report on the matter which he gave to plaintiff in 1988. The report was never given to the defendants.

Defendants requested the production of all documents generated by Montero, Nunez & Associates relating to review or analysis of Brasport's financial statements. That firm was engaged and provided with books and records which they analyzed, thereby determining that certain records were missing, but none of the records examined were produced. Miquel Angel Dequi, executive director of Brasport since

April 27, 1987, and the person in charge of the investigation of Fabbri's activities undertaken by Brasport, testified that there were 12 ledgers which recorded all of Brasport's financial transactions, but none of these were supplied to defendants. The evidence seems to support defendants' claims on this issue. However, the matter need not be pursued since the court finds defendants entitled to judgment on the merits.

## V.

In sum, all plaintiff's claims are dismissed and judgment is awarded defendants.

IT IS SO ORDERED.